UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **AMERICAN PSYCHIATRIC ASSOCIATION** (ON BEHALF OF ITS MEMBERS AND THEIR PATIENTS); **CONNECTICUT PSYCHIATRIC SOCIETY, INC.** (ON BEHALF OF ITS MEMBERS AND THEIR PATIENTS); **CONNECTICUT COUNCIL OF CHILD AND ADOLESCENT PSYCHIATRY, INC.** (ON BEHALF OF ITS MEMBERS AND THEIR PATIENTS); **SUSAN SAVULAK, M.D. D/B/A ASSOCIATES IN PSYCHOTHERAPY & PSYCHIATRY, LLC** (ON BEHALF OF HERSELF AND HER PATIENTS); **THEODORE ZANKER, M.D**. (ON BEHALF OF HIMSELF AND HIS PATIENTS); AND **W.W.** (IN HER INDIVIDUAL CAPACITY) | : : : : : : : : : : : : : : : : : : : : : : | CIVIL ACTION NO. 3:13-CV-00494-JBA |
| Plaintiffs, | : : | JURY TRIAL REQUESTED |
| v. | : : : | |
| **ANTHEM HEALTH PLANS, INC. D/B/A ANTHEM BLUE CROSS AND BLUE SHIELD OF CONNECTICUT; ANTHEM INSURANCE COMPANIES, INC. D/B/A ANTHEM BLUE CROSS AND BLUE SHIELD; WELLPOINT, INC.; AND THE WELLPOINT COMPANIES, INC.** | : : : : : : : : | |
| Defendants. | : | |

## FIRST AMENDED COMPLAINT

### A.   INTRODUCTION

*Access to mental health services is one of the most important and most neglected civil rights issues facing the Nation.  For too long, persons living with mental disorders have suffered discriminatory*

*treatment at all levels of society.* [1]

It is shameful that five years after Congress passed the Mental Health Parity and Addiction Equity Act in 2008 ("MHPAEA") with overwhelming bipartisan support to end this discrimination against those with a mental illness, President Obama still must ask,  "we wouldn't accept it if only 40% of the Americans with cancer got treatment. We wouldn't accept it if only half the young people with diabetes got help.  Why should we accept it when it comes to mental health?"

Although MHPAEA requires equality in benefits for mental health and medical/surgical conditions, the law has not been diligently enforced.  Because of the unjust stigma associated with mental illness – a stigma perpetuated by the discrimination complained of here – mental health and substance use disorder patients are discouraged from enforcing their rights.  Left unchecked, many insurers have continued to discriminate directly and indirectly against persons living with mental health and substance use disorders ("MH/SUD").  Patient suffering continues.

 This First Amended Complaint is an initial step in raising the voices of those with MH/SUDs to ask the Court to step in to enforce the laws designed to protect them by declaring that the Defendants' direct and indirect discrimination against mental health patients is illegal; and compelling the Defendants' compliance with the mandates of federal and state laws requiring that the mental health benefits they provide be equal to the medical/surgical benefits they provide.

Approximately twenty percent of the United States population suffers from a

---

[1] Representative Patrick Kennedy upon introducing the Mental Health Parity and Addiction Equity Act of 2008 in Congress.

mental illness and approximately five percent of that population suffers from a seriously debilitating mental illness. On average, insurance companies in Connecticut charge premiums ranging between $400 and $999 per month, yet report spending only $7.88 to $11.56 per enrollee per month on MH/SUD coverage.  This occurs because insurance companies, like the Defendants, unjustly deny patient care under the guise of "medical" and "network management", employing processes that result in increasing the burden and expense on the patient seeking care for a MH/SUD and in reducing availability of psychiatric physicians from whom the patients may seek treatment.

This First Amended Complaint challenges the manner in which the Defendants have manipulated reimbursement rates for psychiatrists, driven psychiatrists out of their networks and otherwise limited the psychiatrists' ability to provide medically necessary care to patients with MH/SUDs.  Patients and/or their employers have paid, and patients will be asked to pay to insurance companies on health care exchanges, high premiums for MH/SUD benefits.  Defendants reap the benefits of these premiums and should not then be able to block access or make access financially and personally burdensome to obtain.

### B.  THE PARTIES

1.      Plaintiff American Psychiatric Association (hereinafter "APA") is a 501(c)(6) corporation under the Internal Revenue Code that is incorporated in the District of Columbia, with its principal place of business at 1000 Wilson Boulevard, Suite 1825, Arlington, Virginia.  The APA is a membership organization with approximately 34,000 member psychiatrists, 750 of whom practice and/or reside in the State of Connecticut and do business with insurance companies, including the Defendants, on

an in-network or out-of-network basis.  APA's mission includes promotion of the common professional interests of its members, improving the treatment, rehabilitation and care of persons with mental disorders, advancing standards of psychiatric services and facilities, and promoting the best interests of patients actually or potentially making use of mental health resources.  APA brings this First Amended Complaint on behalf of: (a) its member psychiatrists who participate in the Defendants' networks or treat patients on an out-of-network basis who are insured by Defendants; and (b) the patients of its member psychiatrists who are subscribers of and/or beneficiaries covered under the Defendants' health plans.

2.      Plaintiff Connecticut Psychiatric Society, Inc. (hereinafter "CPS") is a 501(c)(6) corporation under the Internal Revenue Code that is incorporated in the State of Connecticut, with a principal place of business at One Regency Drive, Bloomfield, Connecticut.  It is a membership organization comprised of approximately 750 psychiatrists practicing and/or residing in the State of Connecticut.  CPS is an independent district branch of the APA.  CPS's mission is to advocate for psychiatric patients and psychiatrists who care for them, promote and disseminate professional values, and to strengthen the scientific basis of psychiatric diagnosis and treatment. CPS brings this First Amended Complaint on behalf of: (a) its member psychiatrists in the State of Connecticut who participate in the Defendants' networks or who treat patients on an out-of-network basis who are insured by the Defendants; and (b) the patients of its member psychiatrists in the State of Connecticut who are subscribers of and/or beneficiaries covered under the Defendants' health plans.

3.      Plaintiff Connecticut Council of Child and Adolescent Psychiatry, Inc.

(hereinafter, "CCCAP") is a 501(c)(6) corporation under the Internal Revenue Code that is incorporated in the State of Connecticut, with its principal place of business at 104 Hungerford Street, Hartford, Connecticut.  CCCAP is a membership organization exclusively for psychiatrists who specialize in the diagnosis and treatment of psychiatric conditions in children and adolescents.  CCCAP has 225 members in the State of Connecticut.  Its mission is to promote the healthy development of children, adolescents, and families through research, training, advocacy, prevention, comprehensive diagnosis and treatment and to meet the professional needs of child and adolescent psychiatrists throughout their careers.  CCCAP brings this First Amended Complaint on behalf of: (a) its member psychiatrists in the State of Connecticut who are in the Defendants' networks or treat patients on an out-of-network basis who are insured by Defendants; and (b) the child and adolescent patients of CCCAP member psychiatrists in the State of Connecticut who are subscribers and/or beneficiaries covered under the Defendants' health plans.

      4.      Plaintiff Susan Savulak, M.D. d/b/a Associates in Psychotherapy and Psychiatry, LLC (hereinafter, "Dr. Savulak") is a medical doctor certified by the American Board of Psychiatry and Neurology in the practice of psychiatry.  Dr. Savulak is licensed to practice and does practice psychiatry in the State of Connecticut.  Her principal place of business is at 74 East Street, Suite 304, Plainville, Connecticut.  She is a participating provider in the Defendants' insurance plans.  She brings this First Amended Complaint on behalf of herself and on behalf of her patients who are insured by the Defendants.  Patients rely upon their psychiatrists to provide diagnosis and treatment of illness, to defend their need for treatment when the Defendants inquire,

and to correctly bill and code the treatments they provide so that the Defendants will provide coverage and medical records will be accurate. Most patients with a MH/SUD, including Dr. Savulak's patients, are reluctant to individually come forward as plaintiffs in this case because of the unjust stigma associated with mental illness and because acting as a plaintiff in a lawsuit may be stressful and deleterious to their progress in treatment. All of Dr. Savulak's patients assign their claims against Anthem to her. Dr. Savulak is a member of the APA and CPS.

5.      Plaintiff Theodore Zanker, M.D. is a medical doctor certified by the American Board of Psychiatry and Neurology in the practice of child and adolescent psychiatry.   Dr. Zanker is licensed to practice and does practice psychiatry in the State of Connecticut.  His principal place of business is at 315 Whitney Avenue, New Haven, Connecticut.  Dr. Zanker was once a participating provider in the Defendants' plans, but he no longer participates. He brings this First Amended Complaint on behalf of himself and on behalf of his patients who are insured by the Defendants.  Child and adolescent patients and their families rely up their psychiatrists to provide diagnosis and treatment of illness, to defend their need for treatment when the Defendants inquire, and to correctly bill and code the treatments they provides so that the Defendants will provide coverage and medical records will be accurate.  Most patients with a MH/SUD, including Dr. Zanker's, are reluctant to individually come forward as plaintiffs in this case because of the unjust stigma associated with mental illness and because acting as a plaintiff in a lawsuit may be stressful and deleterious to their progress in treatment. Dr. Zanker is a Distinguished Life Fellow of the APA and CPA and past president and current member of CCCAP.

6.     Plaintiff W.W. (hereinafter "W.W.") is an individual who is insured by the Defendants' health plans and has elected to pay additional amounts of money to the Defendants in order to secure an out-of-network benefit option in her health plan.  She is a resident of the State of Connecticut and accesses mental health services through the Defendants' plans.  W.W.'s psychiatrist does not participate in the Defendants' health plans.  W.W. sees her treating psychiatrist for psychotherapy, medical evaluation and management and psychopharmacological management, pays the doctors' fees, and then seeks reimbursement from Defendant Anthem using her out-of-network benefit.  W.W. is not a real name and not Plaintiff's real initials.  She is not using her real name because of fear of discrimination and further stigma if the public knew of her mental illness.

7.     Defendant Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield of Connecticut (hereinafter "Anthem") is a Connecticut corporation with a principal place of business at 108 Leigus Road, Wallingford, Connecticut.  Anthem operates in Connecticut as Anthem Blue Cross and Blue Shield of Connecticut and offers several health plans in Connecticut.   Upon information and belief, Anthem is a subsidiary of Defendants Anthem Insurance Companies, Inc. and WellPoint, Inc.

8.     Defendant Anthem Insurance Companies, Inc. (d/b/a Anthem Blue Cross and Blue Shield) is an Indiana corporation, licensed to do business in the State of Connecticut, with its principal place of business at 120 Monument Circle, Indianapolis, Indiana.  Upon information and belief, Anthem Insurance Companies is the parent of Anthem and other Anthem companies throughout the United States and a wholly owned subsidiary of WellPoint, Inc.

9.     Defendant  WellPoint, Inc. (hereinafter" WellPoint)  is an Indiana corporation, with its principal place of business at 120 Monument Circle, Indianapolis, Indiana.  WellPoint is a holding company that directly or indirectly owns 100% of the stock of Anthem Insurance Companies, Anthem and other insurance subsidiaries. WellPoint reports that it is one of the largest health benefits companies in the United States and, in 2012, posted net profits of over $2.6 billion.  In the first six months of 2013, while the events described herein occurred, WellPoint and its subsidiaries posted net profits of nearly $1.7 billion.

10.     Defendant The WellPoint Companies, Inc. is an Indiana corporation, licensed to do business in the State of Connecticut, with its principal place of business at 120 Monument Circle, Indianapolis, Indiana.  Upon information and belief, The WellPoint Companies, Inc. is a subsidiary of WellPoint.

## C.     JURISDICTION AND VENUE

11.     The Plaintiffs allege violations of the Mental Health Parity and Addiction Equity Act of 2008 (MHPAEA) and its corresponding regulations.  MHPAEA is incorporated into three separate federal statutes, including the Employee Retirement Income Security Act, the Public Health Services Act and the Internal Revenue Code. As this action arises under the laws of the United States, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.  Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over claims arising under state law.

12.     Venue is appropriate in this District under 28 U.S.C. § 1391(b)(1) and (2) as the Defendants reside in this District, other Defendants do business in this District, and substantially all of the actions and omissions committed by the Defendants which

give rise to this Complaint and the injury alleged occurred in this District.

13.     This Court has personal jurisdiction over the Defendants because Anthem resides in this District, other Defendants do business in this District, and because substantially all of the actions giving rise to this Complaint occurred in this District, or had a substantial impact in and have caused injury within this District.

14.     Plaintiffs APA, CPS, and CCCAP have standing to bring this First Amended Complaint on behalf of their members, as the members have standing in their own right, the interests the associations seek to protect are germane to their missions, and neither the claims asserted nor the relief requested require the participation of each individual member in the lawsuit.

15.     APA, CPS, CCCAP, and Drs. Savulak and Zanker have standing to bring this case on behalf of their members' patients and their own patients (respectively) because their members, they, and their respective patients have standing in their own right, have suffered or will suffer injury, and  patients have a close doctor-patient relationship with their psychiatrists involving the patients' reliance on their doctors to diagnose and treat illness, and to handle administrative matters and disputes with their insurer.  The Defendants' unlawful conduct threatens this unique relationship. Additionally, psychiatric patients are generally deterred from bringing litigation themselves because of the unjustified stigma associated with psychiatric illness and because the stress of litigation can be deleterious to their conditions.

16.     The Parties are engaged in a real and justiciable controversy concerning the legality of the Defendants' actions described herein and seek the Court's intervention to resolve the dispute and declare the rights of the Parties.

D.    **BACKGROUND FACTS**

***Mental Health Facts, Insurance Terms, and CPT Codes***

17.     Psychiatrists are medical doctors who specialize in the prevention, diagnosis and treatment of MH/SUDs.  Psychiatrists treat the biological, psychological and social components of mental illness and substance use disorders.  As medical doctors, psychiatrists are trained and qualified to provide basic medical evaluation and management services identical to other physicians.  They attend the same medical school programs as other physicians and, in addition, complete at least another four-year residency program after medical school that focuses on the prevention, diagnosis and treatment of MH/SUDs.

18.     In their lifetime, one in five Americans will suffer a mental illness; five percent of Americans  suffer a severe mental illness. *But less than one third of those who need treatment  have access to the treatment they need to live normal and productive lives.*

19.     Some who suffer from mental illness will not seek treatment because of the stigma associated with mental illness.  Others, who are courageous enough to seek treatment despite unfair stigma, are denied the medically necessary treatment (including psychotherapy services) they seek or are discouraged from obtaining such medically necessary treatment from psychiatrists by health insurance carriers, like the Defendants, who are intent on making a profit at the expense of the patients who pay their fees and the psychiatrists who care for them.

20.     For those fortunate enough to receive adequate treatment, 70 to 90 percent will find relief and a reduction in symptoms, allowing them to have normal lives

as productive members of society. Few treatments for serious medical conditions produce the same success rates.

21.     The availability of medically necessary MH/SUD services in Connecticut and elsewhere in the United States is inadequate to meet the demand for such services by patients in need. The number of psychiatrists is insufficient to meet patient needs and, for those with private health insurance, provider networks are inadequate to timely provide needed mental health services.  While the purpose of health insurance is to facilitate access to medically necessary health care services, insurance carriers, like the Defendants, exacerbate the access problem by discriminating against MH/SUD benefits and patients.

22.      A psychiatrist who participates in a plan's network is an "in-network" provider and contracts with an insurance company. The patients pay only an agreed-upon co-payment and/or deductible and the insurance company pays the doctor an "agreed-upon" fixed fee for service.  In most cases, insurance companies dictate these fees and will not negotiate them.  In-network psychiatrists often take on the responsibility of all administrative services involved in a patient's access to care, including billing, appealing claim denials, and applying for pre-authorizations for treatment.  It is often a complex and tedious process and one that is daunting for patients with MH/SUDs.

23.     Many psychiatrists will not participate in the Defendants' networks because they refuse to accept the fees dictated by the companies, which on average are less than the Defendants pay their non-psychiatric physician colleagues who provide comparable medical services.  Additionally, these psychiatrists find that the

administrative requirements imposed by the Defendants are onerous and may interfere with the doctor's ability to provide quality care.  If patients possess the financial resources, they can see these "out-of-network" or "non-participating" physicians and pay the psychiatrist's fees directly out of their own pocket.  If patients pay additional premiums to the insurance company for an "out-of-network benefit" in their plan, they may be reimbursed by the insurer for the amount that the plan would have paid an in-network doctor, or another rate determined by the company. In the vast majority of circumstances, it is much more expensive for patients to see out-of-network psychiatrists, because patients must pay the difference between what the insurance company will pay and the doctor's market fee.  Moreover, seeing an out-of-network psychiatrist costs disproportionately more than seeing out-of-network, non-psychiatric physician when Defendants reimburse psychiatric patients less for MH/SUD visits than they do for non-psychiatric physician visits, as is the case here.

24.    Psychiatrist participation in an insurance plan is highly consequential to patient access to affordable and appropriate medical treatment.  Yet, the Defendants, through their inequitable billing and reimbursement strategies, make it difficult for psychiatrists to provide and/or be reimbursed for medically necessary psychiatric services to patients at levels that support network participation and are commensurate with non-psychiatric physicians.

25.    CPT, which stands for Current Procedural Terminology, is a listing of descriptive terms and identifying codes for reporting medical services and procedures. The purpose of CPT is to provide a uniform language that accurately describes medical (mental health and non-mental health related), surgical, and diagnostic

services in order to facilitate an effective means for reliable nationwide communication among physicians and other healthcare providers, patients and third parties, such as insurance companies.  CPT is the federally mandated procedure code set, and all health care plans and providers who transmit information electronically are required by federal law to use these established national standards in their business practices.

26.    Each psychiatric diagnosis is represented by a diagnostic code on insurance forms and in patients' medical records.  Each treatment or procedure provided in connection with a diagnosis of an illness is represented on insurance forms, including billing forms, and in the patient's medical records by a CPT code.

27.    Effective January 1, 2013, the federal government adopted changes to certain CPT codes including that psychiatrists who perform or provide medical services similar to other non-psychiatric physicians bill the same CPT codes as their non-psychiatric physician counterparts.  In addition, as a result of these changes, psychiatrists were instructed to use "add-on" procedure codes to insure that other services provided by psychiatrists in the same visit as, and in conjunction with, medical services, such as psychotherapy, would be formally and properly documented and recognized.

28.    In psychiatry, during a patient visit, the psychiatrist may provide primary medical evaluation and management ("E/M") services, which include a medical evaluation of the patient's condition and review of the patient's medications and/or other medical conditions that may relate to the patient's psychiatric illness.  During this same visit, the psychiatrist may also provide other services (e.g., psychotherapy).  In this instance, the psychiatrist records the CPT code for the E/M service and the

additional service and bills the patient or the insurance company for each service (i.e., the E/M service plus the psychotherapy). Non-psychiatric physicians also bill and are paid in this manner, i.e., for a primary medical code and for work in addition to the primary visit/medical service that is reflected in "add-on" codes.

29.     A separate process exists to determine the value of the service reflected by each primary and add-on CPT code. The Centers for Medicare and Medicaid Services ("CMS") establish a total value, including a physician work value for each relevant CPT code. The factors used to determine physician work value include the time required to perform the services; the technical skill and physician effort required; the mental effort and judgment required; and the stress due to the potential risk to the patient. Thus, the value ascribed to the CPT code that represents a more difficult case is generally more than the value ascribed to the more common illnesses. The physician work value for a given CPT code remains the same regardless of the physician's specialty. In other words, the federal government recognizes that any physician that bills a particular CPT code is providing a specific service with a specific value. The Medicare Fee schedule established by CMS is based upon these work values and ascribes the same payment to all physicians who bill the same code (i.e., equal pay for comparable work).

30.     The Defendants have, *de facto*, used the CPT code changes as a platform to limit and distort services provided by psychiatrists, to reduce the fees paid to psychiatrists, to impose a greater burden and expense upon patients receiving psychiatric treatment than they impose upon patients seeking non-psychiatric medical services, and to further hinder access to medically necessary psychiatric care.

31.     The manner in which Defendants have accomplished this has varied since January of 2013, but has never been in compliance with the law.  For example, Anthem originally told psychiatrists that they could not bill or code via an "add-on" for psychotherapy on the same day in which they provided medical services.  This required doctors to either provide a time consuming service, such as psychotherapy, without charge or code, or to ask the patient to come back for psychotherapy on another day thereby making access to needed psychiatric services more restrictive than allowable by law because patients would be required to visit twice for a service that should be provided in one visit and incur more costs associated with another visit.  Moreover, medical records need to be accurate so all treatments need to be coded and noted in the record.  Each of the Defendants' companies implemented the CPT code changes in a manner that similarly discriminated against MH/SUD benefits and patients.

32.     Later, Anthem required psychiatrists to make a note of the psychotherapy service in the patient record, but the Defendants still would not pay for the psychotherapy provided in the same visit.  Notwithstanding the fact that no value was assigned to the psychotherapy add-on code when payment to the physician was considered, Anthem charged the patient a co-payment for each service, increasing the out-of-pocket cost to patients who receive two services in one visit.  Each of the Defendants' companies implemented the CPT code changes in a manner that similarly discriminated against MH/SUD benefits and patients. Some of the Defendants' companies still charge double co-payments to patients who seek medical services and psychotherapy in one visit.

33.     Regardless of the particulars of payment and coding scheme advanced by the Defendants, the distortions created limit the scope of the benefits provided by the plan because they discourage psychiatrists from providing an appropriate scope of service where indicated as medically necessary (i.e., psychotherapy in addition to basic E/M in the same visit) because the payment would be the same regardless of whether one or two services were rendered and regardless of whether the doctor spent 15 or 45 minutes with the patient.  Where psychiatrists do not provide psychotherapy, the patient is required to either see a second provider for that service or return to the same psychiatrist on a different day for psychotherapy services.  Either way, the patient is required to pay additional co-payments and experiences additional time burdens that should not be necessary and are not required of medical/surgical benefit recipients. Many patients will forego medically necessary psychotherapy because they cannot afford the expense or the additional time and inconvenience of receiving it.

34.     The fee schedule issued by Anthem to psychiatrists in January, 2013, did not include all of the CPT codes commonly used for services provided by psychiatrists, which any reasonable beneficiary would presume their health plan covered for treatment of a psychiatric condition.

35.     When Dr. Savulak complained to the Connecticut Insurance Department ("CID"), CID inquired of Anthem and Anthem represented that the fee schedule it provided did not represent all of the codes it would pay for.   Anthem responded that if a psychiatrist wanted to bill for a service that was not represented on its fee schedule (i.e. psychotherapy), the psychiatrist could perform the service, submit a bill for reimbursement and then call Anthem to ask if Anthem would reimburse for the

psychotherapy service and, if so, at what rate.  This business practice is contrary to applicable national standards and common sense.  In effect, Anthem forced psychiatrists to obtain preauthorization for psychotherapy services or otherwise risk non-reimbursement.  In the alternative, Anthem instructed psychiatrists to forego obtaining preauthorization (as the patient's plan did not require such) and roll the dice as to whether Anthem would compensate the physician for the service.  By thrusting the burden of chasing reimbursement onto the psychiatrists, post treatment, at which point Anthem has all the leverage to deny reimbursement under the fee schedule which it controls, Anthem discourages psychiatrists from seeking patients insured by Anthem.

36.     Upon information and belief, Defendants impose greater restrictions on psychiatric physicians and psychiatric benefits in that non-psychiatric physicians are able to bill for primary E/M and add-on services or procedures and are paid the amount set forth in their contract for both the E/M and the related service without being forced into complying with unnecessary administrative burdens or bringing patients back on different days.  Further, the Defendants do not require non-psychiatric physicians to bundle payments for codes into one code that does not accurately reflect the type or amount of work done or level of effort required, and the payment for the add-on service is not haphazardly reduced to achieve budget goals, but reflects the payment for the value of the service performed.  Non-psychiatric physicians are not required to haggle with the Defendants for each patient over which codes not on the fee schedule they can bill and how much they will be paid. The scope of medically necessary care as determined by the physician is not

compromised for medical/surgical benefits in the manner that it is for psychiatric treatment. This discriminatory treatment violates federal and state law.

37.     W.W.'s out-of-network provider sees her for psychotherapy, medical evaluation and management and/or psychopharmacologic management. The psychiatrist's fees have remained constant in 2012 and 2013. Yet, in 2013, when Anthem changed its fee schedule, the amount that Anthem reimbursed for the identical services was almost 50% less than in 2012, causing W.W. to incur out-of-pocket costs that she could not afford to pay, thereby threatening her continued treatment.

38.     APA, CPS, and the Connecticut State Medical Society tried to correct these issues with Defendants. David Fusco, President of Anthem in Connecticut, ignored most of the facts provided to him and would not provide information Plaintiffs requested. He provided no information that would demonstrate compliance with the law but focused instead on the Defendants' bottom line budget goals.

39.     Because Anthem refused to address the issues, Plaintiffs filed their Original Complaint. Thereafter, Anthem entered into a settlement with the CID, which CID later represented is unrelated to the issues presented in this case.

40.     After Plaintiffs filed the Original Complaint, Defendants sent psychiatrists in Connecticut another new fee schedule which they dictated would be effective almost immediately. That fee schedule *dramatically reduced* the amount Anthem would pay for some E/M services and provided some fees for psychotherapy that were so low that there was no incentive to provide that service. In some instances, if a psychiatrist were to provide both E/M services and psychotherapy in one visit,

Anthem's cure to the problem it originally created was to pay that provider 45.5% *less* for providing both services than it originally offered for E/M service alone.  Under the current fee schedule, a psychiatrist will earn a higher fee for psychotherapy if he/she does not offer medical services in the same visit.  Indeed, Anthem pays for psychotherapy *without* medical evaluation and management at a rate that is approximately 66% *more* than when a psychiatrist does the same amount of psychotherapy but also provides medical services in the same visit.

41.     Upon information and belief, many psychiatrists dropped out of the Defendants' network, or refused to take on new patients insured by the Defendants as a result of the Defendants' actions.  The cost to the patient of out-of-network care also increased because the Defendants reimbursed patients at lower rates for the same services in 2013 than they had in 2012.  In short, the Defendants' "fix" exacerbated the problem they had created in that access to MH/SUD treatment has been made more complicated and costly than treatment for medical surgical care.

42.     In other areas of the country, Defendants likewise reduced fees paid to psychiatrists, discouraged the provision of psychotherapy through their fee schedules, and/or continue to charge patients two co-payments when they visit a psychiatrist and receive the full scope of services required.

43.     The Defendants' discrimination against psychiatric patients threatens the availability of in-network psychiatrists (which will force patients to seek care on an out-of-network basis with lower reimbursement to patients than in the past), thereby making affordable psychiatric treatment beyond the reach of many insured patients.  Discouraging providers from providing psychotherapy and E/M in the same session

increases patient costs and discourages them for seeking care.  Continued discrimination against patients with MH/SUDs exacerbates stigma.

44.     When Defendants' customers do not access care, the Defendants will not have to pay for it.  Indeed, since Defendants began manipulating fee schedules in January 2013, they have reported $1.7 billion in profit for the first half of the year putting them on track to beat their 2012 profits of $2.6 billion by the end of the year.

45.     Upon information and belief, all WellPoint subsidiaries have implemented the CPT code changes in a manner that discriminates against MH/SUD benefits, and while there may be variation in practice, the result demonstrates  a coordinated and system-wide violation of state and federal law orchestrated within the WellPoint family of companies.

46.     Defendants pay psychiatrists less on average than other physicians billing the same E/M codes and do not appropriately value the psychotherapy services psychiatrists provide.

47.     For medical/surgical benefits, Defendants do not combine non-E/M services or procedures with the E/M code for purposes of payment; nor do they split one fee between two codes without any regard to appropriate values for those codes; and they do not set rates such that doctors are discouraged from providing necessary care in a manner that increases the burden on the patient.  These actions, which apply to MH/SUD benefits, violate MHPAEA and state law.

48.     The foregoing allegations establish that the Defendants do not use comparable processes and strategies for determining medical/surgical rates as they use for determining psychiatric rates.  Defendants apply their methodologies,

processes and strategies in a manner that is more stringent to mental health than to medical surgical benefits in violation of state and federal law.

49.     The foregoing allegations establish that the Defendants apply treatment limitations and financial requirements to MH/SUD benefits that are more restrictive than the predominant treatment limitations and financial requirements applied to substantially all medical and surgical benefits covered by the plans in violation of federal and state law.

50.     Congress prohibited insurance companies like Defendants from applying financial requirements and  treatment limitations to MH/SUD benefits  that are more restrictive than the predominant financial requirements and treatment limitations applied to substantially all medical surgical benefits, because it concluded that discrimination in this manner causes injury.  It causes stigma, it interferes with the decision to seek care, it interrupts physician/patient relationships, causes patients to face higher costs of health care and more difficulty in accessing mental health care; and psychiatrists are economically disadvantaged, which discourages psychiatrists from participating in the Defendants' networks.  When patients must see out-of-network physicians, their out-of-pocket fees and administrative burdens increase.  If there were sufficient psychiatrists available to patients in Defendants' network, very few, if any, enrollees would need to seek treatment from out-of-network physicians and pay the higher costs involved.

51.     Upon information and belief, Defendants inflate the number of psychiatrists they claim are available in their networks, because they do not actively seek to determine whether the psychiatrists on their list are taking new patients, still

practicing, still living, or otherwise available to Defendants' patients.  Further, the Defendants do not always distinguish in their network list between child/adolescent psychiatrists, other specialist psychiatrists and general psychiatry, thereby creating an unnecessary burden for patients in finding care.  Indeed, a casual survey of random portions of Anthem's network demonstrated that many of the names on the list were duplicates, phones were disconnected, some did not take new patients, others had 3-4 week waiting periods for new patients, and some who are on the list claim they are not Anthem providers.

### *The Mental Health Parity and Addiction Equity Act (2008)*

52.     In 1963, President Kennedy called for equality for persons with mental illnesses.  By 1996, Congress enacted the Mental Health Parity Act of 1996 ("1996 Act"), which eliminated some financial discrimination in the treatment of mental illness.  However, insurance companies found ways to discriminate in non-financial ways, including requiring prior authorizations, concurrent reviews of proposed treatments, making admission to provider networks difficult, and discouraging participation in the network by offering insufficient rates for service. These loopholes made the 1996 Act ineffective.

53.     To close the loopholes in the 1996 Act, Congress enacted comprehensive mental health parity legislation – the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act ("MHPAEA") of 2008.  Congress' primary objectives in passing MHPAEA were to eliminate discrimination in benefits and to improve access to MH/SUD services.  Members of Congress expressed these objectives.  Representative James Ramstad said, "It is time to end

discrimination against people who need treatment for mental illness and addiction.  It's time to prohibit health insurers from placing discriminatory barriers to treatment." Moreover, Representative Bill Pascrell called this "a civil rights issue" and stated, "Parity removes the discrimination against a population that has been discriminated against and stigmatized.  This is a humanitarian issue; without parity, we allow those with illnesses to continue to suffer."  This statutory purpose was specifically acknowledged in *Coalition for Parity, Inc. v. Sebelius*, 709 F. Supp. 2d. 10, 13 (D.D.C. 2010).

54.    MHPAEA prohibits group health plans and health insurance issuers that cover more than 50 employees and offer MH/SUD benefits from imposing financial requirements or treatment limitations on MH/SUD benefits that are more restrictive than the predominant financial requirements or treatment limitations applied to substantially all medical/surgical benefits covered by the health plan or health insurance issuer.  MHPAEA also prohibits group health plans and health insurance issuers from imposing separate financial requirements or treatment limitations that are applicable only with respect to MH/SUD benefits.

55.    MHPAEA defines two key concepts important to compliance with the law - financial requirements and treatment limitations.  Financial requirements are defined as aspects of a plan design that outline cost sharing between the plan and the enrollee, including co-payments, coinsurance, deductibles, and out-of-pocket limits. Treatment limitations are limits on benefits that are based on the frequency of treatment, number of visits, days of coverage, days in a waiting period, or any other similar limits on the scope of duration of treatment.

56.     The Interim Final Rules ("IFR") under MHPAEA further elaborate on the "treatment limitations" described in the statute. The IFR explains that the treatment limitations referenced in MHPAEA can be either quantitative or non-quantitative. Quantitative treatment limitations ("QTLs") are those treatment limitations that are "expressed numerically" (such as calendar year limits on the number of office visits or inpatient hospital days, or lifetime limits on the coverage of benefits).  Non-quantitative treatment limitations, or NQTLs, are treatment limitations, which are not expressed numerically, but "otherwise limit the scope or duration of benefits for treatment under the plan."

57.     The IFR explicitly defined NQTLs subject to MHPAEA standards to include medical management standards; standards for provider admission to participate in a provider network, including reimbursement rates; and plan methods for determining usual and customary rates.

58.     The Defendants' practice of non-payment for psychotherapy services provided by psychiatrists and/or for reduced payment for psychotherapy if the physician also provides medical services in the same visit, and of paying psychiatrists less than other physicians for equivalent work otherwise limits the scope of the health plan's benefit for psychiatric treatment.  This limiting of the scope of the benefit squares the Defendants' practice within the IFR's definition of an NQTL.

59.     A health plan cannot impose financial requirements, QTLs, or NQTLs that only apply to MH/SUD benefits.  Financial requirements, QTLs, and NQTLs that apply only to MH/SUD benefits are separate treatment limitations.  Separate treatment limitations are a *per se* violation of MHPAEA.  Requiring MH/SUD patients

to pay two co-payments for a single visit is a separate financial requirement that per se violates MHPAEA.

60.    The IFR provides a test, which allows plans to equalize, for comparison sake, the NQTL applied to the MH/SUD benefit and the NQTL applied to the medical surgical benefit. If a health plan imposes an NQTL on MH/SUD benefits, the plan must demonstrate that: (1) the NQTL is comparable to the NQTL for medical/surgical benefits; and (2) the NQTL is applied no more stringently to MH/SUD benefits than to the medical/surgical benefits; or (3) there is a recognized clinically appropriate standard of care that permits an exception (i.e., more stringent or non-comparable application) to parts (1) and (2) to the NQTL comparability test above.

61.    Assuming the first test with respect to NQTLs is met, as with financial requirements and QTLs, the plan must then demonstrate that the NQTL is no more restrictive than the predominant treatment limitation applied to substantially all medical and surgical benefits covered by the plan.

62.    The provider admission standards, including the reduced reimbursement rates offered to MH/SUD providers and the codes which are allowed to be billed and payment for them, are NQTLs or separate treatment limitations applied to MH/SUD benefits and must comply with MHPAEA and the IFR. The reduced reimbursement rates and codes allowed to be billed and rates paid for them must also comply with MHPAEA and the IFR when provided on an out-of-network basis.

63.    Likewise, the methods health plans use to determine fee schedules and usual and customary rates ("UCR") for MH/SUD services must be comparable to the methods used to determine the UCR for medical/surgical services and the methods

must not be applied in a more stringent manner when determining MH/SUD rates than when determining medical/surgical rates.

64.     It is inconceivable that a recognized clinically appropriate standard of care would permit a difference in a financial parameter (i.e., how provider rates are established or a UCR methodology is utilized), and therefore, no exception to this rule applies.

65.     Upon information and belief, the Defendants do not set rates or utilize a UCR methodology for psychiatric physicians in a manner which is comparable to and/or applied no more stringently than for non-psychiatric physicians.

66.     Upon information and belief, the Defendants have not had a comparable refusal to pay for services, elimination of codes within licensure, gross underpayment of codes, or forced false billing requirement on the medical/surgical side of the business.

67.     The Defendants can provide no clinically appropriate standards of care that would permit them to engage in the service access and payment discrimination against subscribers with a mental illness that is described above and none exist.

68.     The practices described herein are more restrictive than the predominant limitations applied to substantially all of the medical and surgical benefits covered by the plans.

### _Connecticut's Mental Health Parity Law_

69.     Connecticut's state Mental Health Parity Act requires that all plans offer mental health benefits and that the plans not establish terms or conditions on benefits that place a greater burden on an individual seeking mental health benefits than on an

individual seeking medical/surgical benefits.

### ***The Defendants' Provider Contracts***

70.     The Defendants' contracts with health care providers preclude the
Defendants from discriminating against a member in the provision of covered services
on the basis of the member's health status.  Those contracts also require 30 days'
written notice of any amendment to the contract before the amendment takes effect.

**COUNT ONE**
**DECLARATORY JUDGMENT THAT THE DEFENDANTS VIOLATE MHPAEA**
(By All Plaintiffs)

1- 70.     The Plaintiffs hereby incorporate Paragraphs 1 through 70 of the
Complaint as if fully stated herein as Paragraphs 1 through 70 of the First Count.

71.     The Defendants' implementation of the CPT codes for psychiatry through
their "representative fee schedule," failure to recognize CPT codes, imposition of double
co-payments on psychiatric patients, reduction in rates, disparity in rates between
mental health and medical/surgical services, failure to pay appropriately for
psychotherapy by psychiatric physicians, and other conduct described above imposes
financial requirements, quantitative and non-quantitative treatment limitations on mental
health benefits that are more restrictive than the predominant financial and treatment
limitations applied to substantially all medical surgical benefits and/or impose separate
financial requirements or treatment limitations that are applicable only with respect to
MH/SUD benefits.

72.     The processes, strategies, and methodologies used in applying the
NQTLs to MH/SUD benefits are not comparable to the processes, strategies and
methodologies used in applying the NQTLs to medical surgical benefits and are applied

27

more stringently to MH/SUD benefits in violation of MHPAEA.

73.    There is no recognized clinically appropriate standard of care that would allow this disparity in treatment between mental health and non-mental health benefits.

74.    Wherefore, the Plaintiffs seek a declaration from the Court that:

a.    By engaging in the conduct set forth above, the Defendants have violated, and continue to violate, MHPAEA;

b.    The rate schemes proposed by the Defendants effective January 1, 2013 are illegal and invalid under MHPAEA;

c.    Under MHPAEA, the Defendants may not pay psychiatric physicians less than they pay non-psychiatric  physicians for the same level of service under an E/M code; and

d.    The Defendants are enjoined from continuing violations of MHPAEA in the manner described herein.

## COUNT TWO
## DECLARATORY JUDGMENT THAT THE DEFENDANTS VIOLATE CONNECTICUT PARITY LAWS
(By All Plaintiffs)

1-70.    The Plaintiffs hereby incorporate Paragraphs 1 through 70 of the Complaint as if fully stated herein as Paragraphs 1 through 70 of the Second Count.

71.    The Connecticut Mental Health Parity Act requires the provision of mental health benefits and precludes the Defendants from imposing terms, conditions, or benefits that place a greater financial burden on a patient seeking mental health benefits than on a patient seeking non-mental health benefits.

72.    The Defendants' actions described herein impose terms and conditions on benefits that place a greater financial burden on patients seeking mental health services

than those seeking non-mental health services by, *inter alia*, increasing co-payments, time required for treatment, and payment obligations for out-of-network services.

73.     Wherefore, the Plaintiffs seek a declaration from the Court that:

a.     By engaging in the conduct set forth above, the Defendants have violated, and continue to violate, Connecticut Mental Health Parity law;

b.     The rate schemes proposed by the Defendants effective January 1, 2013 are illegal and invalid;

c.     Under the Connecticut Mental Health Parity Act, the Defendants may not pay mental health physicians less than they pay non-mental health physicians for the same level of service under an E/M code; and

d.     The Defendants are enjoined from continuing violations of the Connecticut Mental Health Parity Act in the manner described herein.

<u>**COUNT THREE**</u>
**THE DEFENDANTS' BREACH OF CONTRACT**
(APA, CPS, and CCCAP on behalf of their members and their patients; and Dr. Savulak on her own behalf and on behalf of her patients)

1- 70.     The Plaintiffs hereby incorporate Paragraphs 1 through 70 of the Complaint as if fully stated herein as Paragraphs 1 through 70 of the Third Count.

71.     Upon information and belief, all of the Defendants' provider contracts impose upon them obligations to conduct utilization/quality management and to administer covered services without discriminating against a member on the basis of health status.  This provision is for the benefit of the physicians and for the patients who are intended third party beneficiaries.

72.     Dr. Savulak and other APA, CPS, and CCCAP members are parties to contracts with Anthem and, upon information and belief, other Defendants which contain

this or an equivalent provision.

73.     Anthem and, upon information and belief, other Defendants breached said provisions by discriminating against mental health patients on the basis of health status (i.e. their status as MH/SUD patients) in the manner described herein.

74.     As a direct and proximate result of Anthem's, and, upon information and belief, the other Defendants' actions, the Plaintiffs have been injured.

## COUNT FOUR
### ANTHEM'S BREACH OF CONTRACT
(By Dr. Savulak)

1-73.    Dr. Savulak incorporates Paragraphs 1 through 73 of the Third Count as if fully stated herein as Paragraphs 1 through 73 of the Fourth Count.

74.     Dr. Savulak is a party to a contract with Anthem that requires Anthem to provide prior written notice of any amendment to the agreement and to provide 30 days for Dr. Savulak to object.

75.     By attempting to amend the Agreement's rate schedule by providing a "representative fee schedule" without requisite notice, and by putting that fee schedule into effect and reducing her compensation retroactive to January 1, 2013, Anthem breached its contract with Dr. Savulak.

76.     Anthem improperly compensated Dr. Savulak according to the "representative fee schedules" since January 2013, as if the contract had properly been amended.

77.     As a result of Anthem's conduct as aforesaid, Dr. Savulak has suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, in accordance with the foregoing, the Plaintiffs pray that the Court award relief as follows:

### *With Respect to Counts One, Two, and Three*

1.    A declaration that:

a.    By engaging in the conduct set forth above, the Defendants have violated, and continue to violate, MHPAEA, the Connecticut Mental Health Parity law, the Connecticut Unfair Trade Practices Act, and their provider contracts;

b.    The rate schemes proposed by the Defendants  and made retroactive to January 1, 2013 for services provided on or after that date are illegal and invalid; and

c.    The Defendants are enjoined from continuing violations of MHPAEA, the Connecticut Mental Health Parity Act, the Connecticut Unfair Trade Practices Act, and their provider contracts in the manner described herein.

2.    Any other relief that the Court deems just and proper.

### *With Respect to Count Four*

1.    Damages

2.      Interest and Costs; and

3.      Any other relief that the Court deems just and proper.


PLAINTIFFS – AMERICAN PSYCHIATRIC
ASSOCIATION (ON BEHALF OF ITS MEMBERS AND
THEIR PATIENTS); CONNECTICUT PSYCHIATRIC
SOCIETY, INC. (ON BEHALF OF ITS MEMBERS AND
THEIR PATIENTS); CONNECTICUT COUNCIL OF
CHILD AND ADOLESCENT PSYCHIATRY, INC. (ON
BEHALF OF ITS MEMBERS AND THEIR PATIENTS);
SUSAN SAVULAK, M.D. D/B/A ASSOCIATES IN
PSYCHOTHERAPY & PSYCHIATRY, LLC (ON BEHALF
OF HERSELF AND HER PATIENTS); THEODORE
ZANKER, M.D. (ON BEHALF OF HIMSELF AND HIS
PATIENTS) AND W.W. (IN HER INDIVIDUAL
CAPACITY)

By /s/ Maria Pepe VanDerLaan
Maria Pepe VanDerLaan – ct10778
mvanderlaan@murthalaw.com
Daniel P. Elliott – ct28058
delliott@murthalaw.com

Murtha Cullina LLP
CityPlace I - 185 Asylum Street
Hartford, Connecticut 06103-3469
Telephone:  860.240.6000
Facsimile:   860.240.6150

Their Attorneys